AGATHA M. ENNIS, Admx., *vs.* R. B. LITTLE & COMPANY.

PROVIDENCE—JULY 14, 1903.

PRESENT:    Stiness, C. J., Tillinghast and Douglas, JJ.

(1)  *Expert Witnesses.*

The competency of persons offered as experts is generally a question to be decided by the trial court.   Unless the ruling of the court is palpably and grossly wrong, it will not be reversed by the reviewing tribunal.

(2)  *Opinion.  Evidence.  Expert Witnesses.*

A question calling for the opinion of an expert, offered by the plaintiff in an action for personal injuries, as to the cause of the accident, is inadmissible and reversible error where it appears that the witness was not testifying from expert knowledge on the subject, but merely as to his opinion based upon the happening of the accident.

(3)  *Master and Servant.  Negligence.  Fellow-Servant.*

A staging used in unloading coal ran upon rollers, and was drawn into the building, when not in use, by the power of an electric engine, applied by means of a boom and rope running over blocks hooked into eye bolts. It was the duty of intestate to fix the tackle and blocks in their places when it was desired to draw in the staging, and give a signal to the engineer to start the engine, and when the staging was in as far as desired to signal the engineer to stop.   The accident happened by the breaking of a bolt.   It was established by expert and other evidence that the cause was not from any defect in the capacity or adjustment of the bolt,

but by the continued application of the power after the staging could be pulled no further:—

*Held,* that the accident happened either through failure of deceased to give the signal in due time, or because the engineer failed to hear it or neglected to obey it; in either case the fault of deceased or his fellow-servant.

TRESPASS ON THE CASE for negligence. Heard on petition of defendant for new trial, and judgment for defendant.

DOUGLAS, J. The defendants are coal dealers in the city of Providence, and occupy a building adjacent to the river for the storage of coal. To facilitate the unloading of coal from vessels lying alongside the wharf and building, a sliding staging or platform forty-one feet long and twelve feet wide had been attached to the building at the height of thirty or forty feet, adapted to be pushed out about half its length and suspended over the hatch of a coal vessel, and when not in use to be partly retracted within the walls of the building. This staging ran upon four rollers and two small wheels, and was drawn in by the power of an electric engine applied by means of the boom and rope which were provided for hoisting coal. This boom was set near the side of the staging and extended out from the building over the water. As used for hoisting, the rope from the drum of the engine passed through a block near the foot of the boom, thence over a block at the outer end, and thence to the bucket to be raised. When it was desired to haul in the staging the rope from the block at the end of the boom was passed almost vertically down and over a snatch-block hooked into an eyebolt at the northeast corner of the staging, thence back over a stationary block attached to a beam inside the building over the runway some fifteen feet from the outer wall, thence to a block hooked into an eyebolt at the southeast corner of the staging. At each outer corner of the staging were upright beams, and the eyebolts referred to were inserted from behind through these uprights and secured by nuts screwed upon their front ends.

The plaintiff's intestate was a dumper, whose duty was to stand near the end of the platform and guide the hods of

coal as they were lifted up, and to empty them into barrows which other men wheeled into the building. When a vessel had been emptied and the use of the platform was temporarily over, it was his duty to fix the tackle and blocks in their places and give a signal to the engineer to start the engine. When the platform had been drawn in as far as was desired, it was his duty to give a signal to the engineer to stop, and then to unhook the blocks and restore the tackle to its place.

December 27, 1899, the plaintiff's intestate was in his place upon the staging directing the movement of drawing it in. He had adjusted the tackle and blocks and given the signal to the engineer to apply the power. When the staging had nearly or quite reached its inner position, the eyebolt in the northeasterly post broke, the block flew upwards, struck the plaintiff in the body, throwing him into the air and inflicting such injuries as caused his death within a few hours. This action was brought to recover on the ground that the eyebolt was improperly adjusted to the upright post, and that the injury to the deceased was caused by this improper adjustment. The defendants denied that the bolt was adjusted as the plaintiff says it was, that it was in any way insufficient for the service it was designed to perform, or that any improper adjustment caused the accident. The jury found a verdict for the plaintiff in the sum of $9,500, and the defendants have petitioned for a new trial, alleging that certain rulings by the court were erroneous; that the verdict is against the evidence; and that the damages are excessive.

The first question raised upon the rulings of the court is upon the rejection of the defendants' question to one of their experts, p. 318, Q. 366: "Now, Mr. Bullock, in the original construction of such a structure at this, and the insertion of eyebolts by ordinary mechanics and men engaged in such construction, is it or not usual to estimate the exact amount of weight that that bolt will endure?"

The discussion about this question seems to have been out of proportion to its importance. We see no reason why the question should have been objected to. It seems rather to be

introductory to something further than to be calculated to elicit anything important by itself.

It was a proper defence to the action to show that the arrangement and strength of the apparatus were like those employed usually by persons in a similar line of business; but how such persons procured their apparatus, and on what principles they selected it, seems remote from a description of what it was.

The form of the question is unfortunate in not indicating any direct application to the issue, and we think the court exercised a reasonable discretion in ruling it out.

(1)   The next class of objections now insisted upon were made to the ruling of the court that certain witnesses produced by the plaintiff were qualified to testify as experts as to the sufficiency of the eyebolt as it was supposed to have been adjusted with reference to the post. The competency of persons offered as experts is generally a question to be decided by the trial court. If error is committed in admitting an incompetent person, the cross examination to which he is subjected may generally be relied upon to show his ignorance and neutralize the force of his opinions. Unless the ruling of the court is palpably and grossly wrong, it will not be reversed by the reviewing tribunal. Rogers on Expert Testimony, §§ 22, 23; Lawson on Expert Evidence, 276, 468; Gillett on Indirect Evidence, § 209; *Howard* v. *Providence,* 6 R. I. 514; *Sarle* v. *Arnold,* 7 R. I. 586.

The first of these witnesses, Mr. Meehan, was a contractor and builder of many years' experience in the use of eyebolts. His opinion might have been useful if the elements of the problem had been given him.

The objection seems more appropriate to the testimony he gave than to his admission as an expert generally. The fact was developed, in the course of his examination, that, while he knew that an eyebolt of a certain size would carry a certain strain, he did not know how much more it would carry before breaking; and that, while an eyebolt projecting part way from a beam, leaving drift or leverage, would offer less resistance to a transverse strain than one which was

driven in till the eye touched the wood, he had no accurate knowledge of the comparative strength of the bolt in these different adjustments. Inasmuch as the defendants' experts also said that drift or leverage would diminish the power of a bolt to resist transverse strain, and inasmuch as the mechanical principle involved is commonly known to intelligent people, it does not seem that the evidence of this witness ought to have seriously harmed the defendants.

The next witness was Joseph McAlpin, who had charge of a department in a bolt manufactory. This employment would seem to be sufficient qualification to admit him to testify as to the capacity of eyebolts.

The court could not anticipate the insufficiency of his knowledge in a preliminary examination. It appeared afterwards that he had no accurate knowledge of the tensile strength of iron; and, consequently, the opinions which he gave should have had little weight with the jury.

Edward McCormick had been a rigger of derricks a number of years, and Thomas D. Wallace had had long experience in the use of eyebolts. The observations made in regard to Joseph McAlpin apply to these witnesses also. There is nothing in their testimony which contradicts the exact evidence of the defendants' experts as to the sufficiency of the particular bolt in question to support the definite strain which it was intended to resist. Some of the questions, however, which were asked of these witnesses were admitted against the objection of the defendants, and their exceptions, duly taken, must be considered.

In the examination of Michael Meehan the following appears: "Q. 70. If the testimony in this case shows that that bolt was driven home and was in use six months, and on a certain day, in order to get the nut on the outside of the post out of the way from rubbing on the ropes running there on the outside of that post, was countersunk sufficient to take in that nut and the bolt was hammered back level with the outside of the post so that there was a leverage there of from one to one and a half inches that did not exist before, and the next time that strain was put upon the eyebolt it broke,

what would you say as to the connection in the change of the eyebolt and the breaking of the eyebolt? (Objected to; admitted; exceptions taken by Mr. Baker.) A. I should say that the change in the leverage on the bolt by reason of its being driven away from the post was the cause of the breaking."

Substantially the same question was asked of Joseph McAlpin, p. 112, and again of Thomas W. D. Wallace, p. 205, and admitted against defendants' objection.

The defendants' counsel now urges that this evidence was improper. He says; "It was asked for the purpose of showing that the cause of the accident was a defective condition of the eyebolt in the position it was in at the time the accident occurred; and the witness was asked, in effect, what the idea would be as to the defective condition based upon the happening of the accident?"

We think this criticism is just. The defendants were negligent of their duty if they allowed the eyebolt to be adjusted so as to weaken it beyond the limit of safety for the load it was to carry. After the accident occurred it was easy to see that it would not sustain the strain which was put upon it; but it by no means follows that, with the knowledge which could have been obtained before the bolt broke, the defendants should have known that it was not sufficient for the strain. The question is improper, as the knowledge called for is not expert knowledge, but an inference of fact which the jury could make as well.

It does not appear that either one of these witnesses knew enough about the tensile strength of iron to have anticipated this accident. It did not need experts to say, after the accident occurred, that the thing which broke must have been subjected to a greater strain than it could bear. Two of these experts had never seen a bolt break; one of them had tested bolts, but knew only from the tables at what tension the breaks occurred. None of them pretended to say with any accuracy what was the *maximum* load which the bolt in question could safely bear; but when it broke, as supposed in the question, it was easy for them to form an opinion as

to the cause. Evidently such an opinion was based on the occurrence of the accident, and ought not to have been the basis of estimation of the defendants' responsibility.

It may be said that the jury ought not to have been misled by such evidence, but we cannot say they were not. These witnesses were practical men, familiar with the uses of such appliances; what more natural than for the jury to rely upon their judgment in preference to the more accurate, but more technical, evidence of engineers and professional men, whose knowledge is often depreciated as theory and fancy.

Aside from the error in admitting this evidence, which would entitle the defendant to a new trial, we find the verdict to be against the evidence upon the question of the defendants' negligence. The evidence greatly preponderates in support of the defendants' assertion that the bolt, at the time of the accident, had not been changed in its relation to the beam, after it was first placed there, but had been used exactly as it then was for about a year.

The plaintiff claims that the projection of the end of the bolt on which the nut was screwed interfered with the rope in hoisting, and that Mr. Quinn accordingly dug into the beam a place large enough to receive the nut and drove the bolt through till the nut was countersunk and the eye projected on the other side and formed a leverage or drift which weakened the appliance and caused the accident.

The story that Quinn countersunk the nut depends upon two witnesses, Walter B. Guy and Patrick J. Ennis, a cousin of the deceased. They were testifying a year after the occurrence, and in the meanwhile boards had been nailed against the timber so as to give the impression to the observer that the nut upon the new bolt which was substituted for the broken one was countersunk, as it was masked by the sheathing.

It is easier to believe that these witnesses are giving from memory their impression of the conditions after the accident from examination made just before the trial, than that the witnesses who positively contradict them on this point were mistaken. Quinn swears that the bolt which broke was not

taken out from the time it was first put in until it broke; that the post was never countersunk.

Frank D. Simmons, Robert B. Little, and Thomas F. Callaghan testify the same.

In this conflict of testimony we might hesitate to accept this mere preponderance as conclusive against the implied conclusion of the jury, but the post itself is in evidence and tells its own story. Upon it there is no trace of any recess for the nut. It is true that, after the post had been taken out of the staging and brought into court, the same two witnesses pretended to say that it was not the one which had stood at the northeast corner of the platform; but, against the overwhelming testimony of Quinn, Ramos, Hill, Williams, Bermer, and Simmons, who assisted in taking it out and identified it in court, it is incredible that this impeachment, involving a barefaced fraud upon the court which could have been detected at the time by an inspection of the staging, should have had any foundation. We cannot doubt that the post produced is the one in which the bolt was fastened; and, consequently, that the plaintiff's theory of the cause of the accident is erroneous.

(3)    The second contention of the defendants is that whatever may have been the position of the bolt in the post, it was strong enough to sustain the strain which it was designed to bear.

This claim is supported by all the positive testimony in the case. Certain measurements were taken by the defendants' experts, and their figures are not contradicted. The weight of the platform to be hauled in was found to be 13,275 pounds; to start it required a force of 2,250 pounds, and to keep it in motion after it was started, a force of 1,800 pounds. About one half of these strains was sustained by the eyebolt in question, and about half by the one in the southeast post.

The angle between the two lengths of rope which extended to the northeasterly eyebolt from the boom, and thence to the beam over the run-way, determined the direction in which the pulling force was exerted upon the bolt. This direction was necessarily in the plane of these sections of rope,

and practically half way between them. The *maximum* angle which this line of force formed with a line perpendicular to the post occurred when the platform was pulled in against the chock, and then was about forty-five degrees. When the staging was extended this angle became more acute. It follows that the force required to move the staging increased somewhat as it approached the building and as the angle of application of the power to the direction of its progress became greater; and, accordingly, the witnesses have taken account of this increment in calculating the required power as if it were to be applied at an angle of forty-five degrees. While this change of angle in the application of the force increased the strain upon the bolt as it approached the building, the power exerted never approximated the force exerted at the starting point.

The plaintiff's experts all express the opinion that the bolt, if it projects two inches from the post, would be unsafe; but none of them place the limit of capacity below the actual strain which was normally exerted by the rope upon the bolt. Mr. Meehan testifies that a safe load for this eyebolt in a straight pull would be ten tons—*i. e.*, twenty thousand pounds. Supposing the eye to be close up to the wood, he says: "If the pull was in any direction except in a line with the eyebolt it would carry safely, I think, three tons." Mr. McAlpin declines to state how much of a load such an eyebolt can carry. Mr. McCormick does not know what weight a ⅞-inch eyebolt would carry, but he thinks three tons. He does not know what load would be safe to put upon it.

Thomas D. Wallace says that if the strain came at forty-five degrees, as he had used eyebolts on board ship for hoisting, he would not trust more than fifteen hundred pounds on a ⅞-inch eyebolt. He puts the capacity of such a bolt to sustain a straight pull at "from one ton to twenty-five hundred net."

If we take these figures and compare them with the actual strain laid upon the bolt in moving the platform, as sworn to by the defendants' experts and not contradicted, the opinion of these gentlemen that the bolt was insufficient is disproved by their own calculations. This appears still more

clearly from the evidence of the defendants' experts. They agree upon the tensile strength of first quality American iron, which this bolt was made of, and tell us that such iron, if subjected to transverse strain, would first bend ninety degrees, and then, before breaking, would sustain five-sixths of the load which it would bear if applied in a straight pull; and from these elements they show that, even if the eye projected two inches from the wood, it would still leave an ample margin of safety.

Mr. Bullock fixes the strength of the bolt to resist a direct pull at 28,000 pounds, and estimates its efficient strength, in the least favorable adaptation claimed in this case, at ten or twelve thousand pounds; as the defendant claimed it to have been placed, at nineteen thousand pounds. Mr. Hatch thinks this bolt would stand a direct pull of upwards of twenty thousand pounds; Mr. Bliss made calculations of the load which the bolt was normally required to sustain, and finds the bolt amply competent for its work.

This conclusion rests upon actual measurements of the load to be moved and accurate calculations from well established scientific facts in regard to the strength of iron. These facts and mechanical laws also support the statement of the defendants' experts that the breaking of the bolt cannot be accounted for except on the supposition that some obstacle was interposed to the progress of the staging which brought an extraordinary strain upon the bolt. It appears that the bolt actually sustained a strain of 1,125 or 1,150 pounds when the staging started, and that after the start the strain upon it from the resistance of the staging was about 900 pounds only. It is a necessary inference, therefore, that some greater force than the normal resistance of the staging must have interposed to break the bolt.

This conclusion is corroborated by an inspection of the bolt itself. All agree that it is of the best American iron and perfect in structure. The break shows no flaw and no defect in the welding. It indicates that the iron was pulled apart by an extraordinary force. It further appears that the breaking force was exerted nearly in the axis of the end

which broke off. The bolt first bent until the projecting end coincided very nearly with the line of force, and then yielded to an enormous tension and parted. From the inclination of the hole in the post, which was about twenty degrees, and the angle of flection of the bolt, it is apparent that when the bolt broke the direction in which the pull came was about what was found when the platform was drawn in against the stop.

The testimony of the witnesses who saw the accident is conflicting as to how far the staging was in when it occurred. The two witnesses for the plaintiff, whom we have formerly referred to, say that it was not completely in; Guy's testimony is that the platform was drawn in immediately after the accident some five feet, and then did not reach the spud by a couple of feet. A rope was put around the post and the block hooked into that, and the platform was hauled in by the engine. Mr. Callahan, Mr. Ross, and some other men were there; Mr. Patrick Ennis was not.

Patrick Ennis says the platform extended twenty feet from the building, and when it had been drawn in about eight feet the eyebolt broke. The deceased was standing near the northeast corner of the staging, but in the angle formed by the parts of the rope which ran from the block inside to the two corners. "When the bolt broke the block came loose and hit him in the stomach, and the eyebolt went in about twenty feet and Dick went up in the air about seven feet. He went straight up and I caught him, and then he dropped down on the staging. He remained there a moment, and Mr. R. B. Little came up and said, 'Take him into the engine room.' He was unconscious." The witness further testifies that before the accident there was no spud, or chock, or appliance to arrest the motion inwards of the platform. "I remember well there was nothing there to stop it." He denies that he told Quinn that the accident was caused by running the engine after the platform was against the chock.

William Quinn heard of the accident an hour after and went to examine the staging, and found it was way in against the stop. Callahan, Guy, and Patrick J. Ennis were there.

Ennis told witness that this happened because the engine was run back hard, putting the platform back against the chock, and that was the cause of the breaking of the bolt.

Robert B. Little went up to the staging as soon as he heard of the accident. (According to Patrick Ennis this was before the injured man had been moved.) At that time the staging was away in.

Thomas F. Callahan, one of the three persons who saw the accident, says: "He was stooping down like this to unfasten the block; he signaled the engineer, and when he signaled him he stooped to unfasten the block, and the engineer said he got the power on and the bolt broke." The staging was home when the bolt broke. It was not pulled in as Patrick Ennis testified, immediately after the accident. After being extended again, a day or two later, it was pulled in by means of a rope, as was stated by Ennis, before they rigged a new bolt. "When Mr. Richard Ennis" (the deceased) "signaled the engineer to stop he didn't stop; he kept on with the power, and that is what broke the bolt." Patrick Ennis was not on the platform at the time of the accident, but stood near witness inside the building. The staging stopped, and immediately after the staging stopped the bolt broke. In cross-examination he says he did not look at the chock to see whether the platform touched it or not.

Neil Ross was in charge of the engine. He did not hear any signal from the deceased. "I saw the staging stop and the eyebolt break, and as soon as I saw the staging stop I stopped the machine; the eyebolt was broken then. I looked at the staging after the accident to see how far in it was. It was against the stop block. There was no rope hitched to the post that day to draw it in with. Deceased was standing over the block when he was struck, not over six inches away from it. After the accident all the men went home, and this staging stayed where it was all day." The motor is thirty-five horse-power; when the lever is in the eighth notch the full power is on; when the lever is in the third notch the power is sufficient to move the platform. It starts with four notches and continues with three.

In comparing the account given by Ennis, corroborated in part by Guy, with that of Callahan and Ross, it must be noted that the former witnesses are already discredited in the matter of the identity of the post, and contradicted in respect to the countersinking of the bolt, and now are met by another flat contradiction, from several witnesses, in respect to the platform being home at the time of the break.

Their story is further open to the insuperable objection that it gives no rational cause for the breaking of the bolt.

If there had been no chock there the staging would have continued to be drawn in, so long as the power was applied, until it had gone far beyond the point where any of the witnesses place it, without developing any extraordinary strain upon the eyebolt. If, on the other hand, the deceased gave the signal to stop and leaned over as he did so to unhook the block when the line should slacken, and if the engineer, not hearing the signal, kept the power on after the platform had brought up against its rest, the accident is rationally explained.

If there can be any doubt that this explanation is the true one, we think it must be dissipated by the expert evidence in the case which we have already cited.

The fact is established, therefore, that the accident was caused, not by any defect in the capacity or adjustment of the bolt, but by the continued application of the power after the platform could be pulled no further. This must have happened because the deceased failed to give the signal in due time, or because the engineer failed to hear it or neglected to obey it. In either case the defendants are not liable.

The machinery was in proper condition to do the work it was intended for. The fault, if there was any, was that of the deceased or his fellow workman.

It is further contended by the defendants that the deceased was guilty of contributory negligence in taking the position he occupied over the block before the platform had stopped. As we have found no defect in the attachments of the block which ought to have been known to the defendants, we cannot say that there was any danger there which the deceased

should have avoided.  If the signal had been heard and obeyed there would have been no danger.

It is not necessary to discuss the question of damages.

The case will be remitted to the Common Pleas Division, with direction to enter judgment for the defendants.

*John W. Hogan, Stephen J. Casey, and Philip S. Knauer,* for plaintiff.

*David S. Baker and Lewis A. Waterman,* for defendants.